# DAVID PRESTON *et al.*

*v.*

# JESSE SPAULDING *et al.*

*Filed at Ottawa March 22, 1887.*

1. RESCISSION OF CONTRACT—*for fraud—jurisdiction in chancery.* The jurisdiction of courts of equity to decree the rescission of contracts for fraud, and to administer those remedies which are dependent upon such rescission, is unquestionable.

2. SAME—*right to affirm, or rescind a fraudulent contract—intervening rights of third persons.* A contract tainted with fraud is not absolutely void, but only voidable. Therefore, a vendor, after knowledge of the fraud of his vendee, may affirm the sale. As a general rule, the vendor may disaffirm the sale after notice of the fraud, and recover back his property if still in the hands of his vendee, or the value of it. But if he lie by, after notice, till the rights of innocent persons intervene, his right to rescind is gone, or is postponed as to such innocent third persons.

3. So if the vendor of personal property has, in whatever good faith, though not exercising proper care in that regard, through a series of years, held out to the world his vendees as men of financial ability, and as worthy of credit, and sells them a large amount of goods on credit, clothing them with the apparent ownership free of incumbrance, and also makes representations as to the ability of his vendees, and they receive credit from others on

Syllabus.

the faith of their ownership of such goods, or of such representations, a court of equity will not rescind the sale of the goods, in favor of such vendor, on account of fraudulent representations made to him by the vendees, as against the equitable rights of those who trusted such vendees on the faith of the misleading action of such vendor; but as to all goods sold by such original vendor after the giving of credit to the vendees by others, the rule is different, as no credit was given on account thereof.

4. SAME—*rescission must be in toto, or not at all—placing the parties in statu quo.* A party can not rescind a contract for fraud, and at the same time retain the consideration, in whole or in part, which he has received under it. He must rescind *in toto*, or not at all. But, as between vendor and vendee, a court of equity will not deny the vendor a rescission of the contract for the reason that the vendee may have put it out of his power to restore all the property, on account of sales by him to innocent purchasers.

5. INSOLVENT DEBTOR—*assignment for benefit of creditors—jurisdiction of the county court, and of a court of chancery.* Where the property of an insolvent debtor, under a voluntary assignment for creditors, has passed into the hands of the assignee, the county court has ample power and jurisdiction to direct and control the disposition to be made of such property under the statute, and, in so doing, to adjudicate upon the conflicting legal rights of claimants therefor, arising in that court.

6. The county court is not, however, by the Voluntary Assignment act, invested with general chancery powers and jurisdiction, such as of a bill to set aside a sale or contract for fraud, or to set aside unauthorized preferences given by the debtor by confession of judgment, or of a bill for specific performance, or to remove a cloud from title. As to matters purely of an equitable character, resort must still be had to the courts of general chancery jurisdiction.

7. After a general assignment by a debtor for the benefit of his creditors, property of the debtor which had not been reduced to possession by the assignee, came into the hands of a receiver, who had been appointed by a court of chancery in a suit involving the claims of certain creditors, and their equitable rights in respect of the application of the fund so in the hands of the receiver. The chancellor proceeded to an adjudication as to equities thus arising. To turn over the fund so in the hands of the receiver, into the hands of the assignee under the general assignment, to be administered by the county court, under the rules which must there obtain, would be to deprive the creditors whose equities had been determined in chancery, of the benefit of that determination. So it was *held*, that the fund ought not to be surrendered to the assignee, but should be retained by the court of chancery, and its distribution directed according to the equitable rights of the parties as they had been found to exist.

8. It being the duty of an assignee of an insolvent debtor to sue for and recover everything belonging to the estate assigned, upon his neglect or refusal to take proper proceedings to protect the trust estate, or to reduce it to

14—120 ILL.

possession and gain its control, the right of the creditors to come into a court of equity and assert their rights and seek protection of their interests can not be denied.

9. SAME—*giving preference among creditors.* The act relating to voluntary assignments does not interfere with the action of the debtor while he retains dominion of his property. He may, in good faith, sêll his property, mortgage or pledge it to secure a *bona fide* debt, or create a lien upon it by operation of law, as, by confessing a judgment in favor of a *bona fide* creditor.

10. After a debtor, however, has made up his mind to make an assignment of his property for the benefit of creditors, all conveyances, transfers and other dispositions of his property or assets, made in view of his intended general assignment, whereby any preference is given, will, in a court of equity, be declared void, and set aside, the same as though incorporated in the deed of assignment itself.

11. Certain debtors being aware of their hopeless insolvency, and having determined to make a disposition of their estate among their creditors, made preferential payments and conveyances of real estate to various relatives in satisfaction of alleged indebtedness, and then, without solicitation made, delivered a series of judgment notes for the purpose of preferring certain others of their creditors, and lastly made a deed of assignment for the benefit of creditors generally, in form free from legal defect. The assignment was not filed until the favored creditors had time to take judgments and take out executions before the assignee could take possession: *Held,* that such preferences were in fraud of the statute, and were properly set aside in a suit by the other creditors having no preferences.

12. The act relating to such assignments does not attempt to regulate the conduct of creditors. Its object is to regulate the conduct of the debtor, and make void, preferences given by him in an assignment of his estate. Creditors procuring security or payment in good faith, are not affected by the act.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. THOMAS A. MORAN, Judge, presiding.

Mr. W. H. SWIFT, Messrs. C. H. & C. B. WOOD, Mr. EDWIN F. BAILEY, and Messrs. JONES & JONES, for the appellants:

The circuit court had no jurisdiction, for the reason that the jurisdiction of the county court is plenary, and exclusive as to all property covered by the assignment. *Freydendall* v. *Baldwin,* 103 Ill. 325; *Hanchett* v. *Waterbury,* 115 id. 220.

An unsecured creditor can not enjoin a sale under an execution against his debtor, under a judgment fraudulently confessed, where complainant has no judgment. *Schufeldt* v. *Boehm*, 96 Ill. 560; *Freydendall* v. *Baldwin*, 103 id. 325; 10 Bradw. 106.

None but judgment creditors can obtain an injunction to prevent a fraudulent disposition by a debtor, of his property, nor to impeach a fraudulent conveyance made by him. Bump on Fraud. Con. (3d ed.) 527, 533, 534, 461, 462; *Goembel* v. *Arnett*, 100 Ill. 42; *Phelps* v. *Foster*, 18 id. 309; *Horner* v. *Zimmerman*, 45 id. 14; *McConnell* v. *Dickson*, 43 id. 100; *Newman* v. *Willetts*, 52 id. 98.

Application to set aside a fraudulent judgment can only be made by a judgment creditor. Bump on Fraud. Con. 521; *Wintringham* v. *Wintringham*, 20 Johns. 296.

A creditor can not be permitted to assail and claim under an assignment. *Wright* v. *Ziegler*, 70 Ga. 512.

The assignee has no greater title than the assignor, and can not avoid his acts. He takes as a volunteer. *Hardin* v. *Osborne*, 94 Ill. 576; *O'Hara* v. *Jones*, 46 id. 292; *Jenkins* v. *Pierce*, 98 id. 651.

The duty of the assignee is confined to the distribution of the proceeds of the property assigned to him. *Lund* v. *Skane Bank*, 96 Ill. 183.

Section 13, of chapter 10, of the Revised Statutes, is taken from the Missouri statute of 1855, page 210, which has been construed in *Shopleigh* v. *Baird*, 26 Mo. 322, and *Crow* v. *Beardsley*, 68 id. 437.

The statute makes void only preferences in the assignment, and not those otherwise given. *Blakely's Appeal*, 7 Pa. St. 449; *Hutchinson* v. *McClure*, 20 id. 63; *Wilson* v. *Berg*, 88 id. 167; *Garretson* v. *Brown*, 26 N. J. L. 425; *Bates* v. *Coe*, 10 Conn. 280; *Perry* v. *Holden*, 22 Pick. 269; *Fairbanks* v. *Haines*, 23 id. 323; *Lampson* v. *Arnold*, 19 Iowa, 479; *Van-Patten* v. *Burr*, 52 id. 518.

The sales made by Spaulding to Hair & Odiorne can not be rescinded to the prejudice of appellants. The court, having taken jurisdiction, should have exercised complete jurisdiction, and administered fully upon the funds in the custody of the court.

Messrs. JENKINS & HARKNESS, for the appellee Jenkins, assignee:

The jurisdiction of the county court, while exclusive as to all questions affecting the distribution of the estate in its possession, does not forbid a resort to other tribunals, when necessary to bring any portion of the estate within its control.

If the judgments under which appellants claim "were and are in fraud of the law prohibiting preferences," the assignee or creditors can recover the fund.

The principle that the assignee takes as a volunteer, can not be so applied as to prevent the recovery of preferences prohibited by law. The property assigned to him includes preferences made contrary to law.

Messrs. DEXTER, HERRICK & ALLEN, and Mr. MELVILLE W. FULLER, for the appellee Spaulding:

The circuit court had jurisdiction. The bill is not a creditor's bill, but a bill by a *cestui que trust* to enforce the rights of his trustee, who has refused to act.

A voluntary assignment creates a trust, and any creditor who is beneficially interested in the assignment, may file a bill to protect the trust property, on the refusal of the trustee to act. *Shyer* v. *Lockhard,* 2 Tenn. Ch. 365; *Weir* v. *Tunnehill,* 2 Yerg. 57; *Geisse* v. *Beall,* 3 Wis. 367; *McDougald* v. *Dougherty,* 11 Ga. 570; *Jones* v. *Dougherty,* 10 id. 273.

A creditor may, by his bill, have preferences declared void, under the Assignment law. *Holt* v. *Bancroft,* 30 Ala. 193; *Kellogg* v. *Root,* 23 Fed. Rep. 525.

The preferences in favor of appellants were contrary to the statute, and void. Any act done in fraud of law, is done in violation of it. *In re King,* 2 Wheat. 153; *Lee* v. *Lee,* 8 Pet. 44; Kerr on Frauds, 279, 288.

That preferences made in contemplation of and with a view to insolvency and an assignment, are void, see *Berry* v. *Cutts,* 42 Me. 445; *Livermore* v. *McNair,* 34 N. J. Eq. 478; *Perry* v. *Holden,* 22 Pick. 269; *Holt* v. *Bancroft,* 30 Ala. 193; *Van-Patten* v. *Burr,* 52 Iowa, 518; *Burrows* v. *Lehndorff,* 8 id. 96; *Hahn* v. *Salmon,* 20 Fed. Rep. 801; *Kellogg* v. *Root,* 23 id. 525; *Doggett* v. *Herman,* 5 McCrary, 269; *United States* v. *Griswold,* 8 Fed. Rep. 496.

The holder of a judgment or attachment lien is not a purchaser. *Schweizer* v. *Tracy,* 76 Ill. 345; *Field* v. *Stearns,* 42 Vt. 106; Freeman on Judgments, sec. 357.

The complainant had the right to rescind, and reclaim so much of the lumber levied upon as was sold by him subsequent to the contract of May 5, 1882.

The jurisdiction of a court of equity to rescind for fraud is shown by *Henshaw* v. *Bryant,* 4 Scam. 97, *Cady* v. *Whaling,* 7 Biss. 430, *Bradbury* v. *Keas,* 5 J. J. Marsh. 446, and *Tayman* v. *Mitchell,* 1 Md. Ch. 496.

The false statements of Hair & Odiorne, as to their financial standing, acted upon, will avoid the sale to them. Cooley on Torts, 479; *Eaton* v. *Avery,* 83 N. Y. 31.

If complainant had a right to rescind as against the debtors and their assignee, can he assert that right as against appellants? The vendor's right to rescind can only be defeated by a sale or mortgage of the property to a *bona fide* purchaser. *Strauss* v. *Kranert,* 56 Ill. 254; *Schweizer* v. *Tracy,* 76 id. 345.

As to a vendor's right to rescind for fraud as against an attaching or judgment creditor, see Benjamin on Sales, 418, note 1; *Field* v. *Stearns,* 42 Vt. 106; *Devoe* v. *Brandt,* 53 N. Y. 462; *Schweizer* v. *Tracy,* 76 Ill. 345.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

The bill of complaint in this case was framed upon the theory, that the debtors having preferred certain of their creditors by confession of judgments, and the same day having made their general assignment for the benefit of creditors, under a statute prohibiting preferences, and the trustee under the assignment having refused to do so, the complainant, who was a creditor and a beneficiary, had the right to resort to a court of equity, and there attack the illegal preferences, and procure them to be set aside as void, because the giving of the judgment notes, and the making of the deed of assign-ment, were parts of the same transaction. The bill further sought rescission of contract in respect of more than $246,000 worth of lumber sold and delivered by the complainant to the assignors within the preceding six and a half months, for the reason that the same was bought and procured upon false and fraudulent representations, and to have the property sold restored to him.

It is objected that the circuit court could not take jurisdiction of the bill for either purpose. As was said by the Appellate Court in this case: "The jurisdiction of courts of equity to decree rescission of contracts for fraud, and to administer those remedies which are dependent upon such rescission, is well established. Pomeroy's Eq. Jur. secs. 110, 112." See, also, *Henshaw* v. *Bryant,* 4 Scam. 97, *Wing* v. *Sherrer,* 77 Ill. 200, *Frazier* v. *Miller,* 16 id. 48, *Oard* v. *Oard,* 59 id. 46, *White* v. *White,* 89 id. 460, and *McCormick* v. *Miller,* 102 id. 208, where the principle announced has been recognized and enforced by this court. In so far as relief of this character was sought by the bill, the jurisdiction of the court can not be questioned.

Whether the jurisdiction of the court can be sustained upon the other grounds stated in the bill, involves the consideration of questions of importance. This is not a creditor's bill,

or a bill of that nature, and the rules of law in respect of such bills have no application here. The complainant comes into court under circumstances showing that he is a large unsecured creditor of Hair & Odiorne; that his debtors have executed a general assignment for the benefit of creditors, and, at the same time, preferred certain of their creditors; that the assignee or trustee had refused to attack the preferences alleged to be void, and under which, substantially, the whole of the assignor's estate is kept from the possession and control of the assignee. At the very threshold of the court he concedes the right, and asserts, inferentially, the duty, of the assignee to sue for and recover, in his name and character of assignee, "everything belonging or appertaining to" the estate of his assignors. That such is the right and duty of the assignee, admits of no doubt. Section 11 of the Voluntary Assignment act is both his warrant and mandate. But while this is so, it is also true that the assignee takes the estate assigned, in trust, to administer and apportion among the creditors of the assignors, and upon his neglect or refusal to take proper proceedings to protect the trust estate, or, as in this case, to reduce it to possession and gain its control, the right of the creditors (*cestuis que trust*) to come into a court of equity to assert their rights and protect their interests, can not be denied. *Shyer* v. *Lockhard,* 2 Tenn. Ch. (Cooper,) 365; *Weir* v. *Tannehill,* 2 Yerg. 57; *Goncelier* v. *Foret,* 4 Minn. 13; *McDougald* v. *Dougherty,* 11 Ga. 570; *Jones* v. *Dougherty,* 10 id. 273; *Hayes* v. *Doane,* 11 N. J. Eq. (Stockt.) 84; *Holt* v. *Bancroft,* 30 Ala. 193; *Kellogg* v. *Root,* 23 Fed. Rep. 525.

The question is then presented, whether, under the allegations and proofs, the court erred in finding and holding that the confession judgments were void, under the statute. That Hair & Odiorne were wholly insolvent, is beyond question. They were indebted to complainant, $246,963.80; to preferred judgment creditors, $90,413.17, and in other ways

quite enough to swell the aggregate to $350,000, while their assets, upon the basis of their own schedule, and presumably liberally estimated, and with their notes and accounts at their face, did not exceed $270,000, leaving an apparent deficit of $80,000,—in the nature of things much below the actual amount. It is clearly shown by the record, that as early as September 30, 1882, they began preparing for the failure by a secret transfer of real estate; and on that day, and during the twenty-five days following, four conveyances were made of their individual real estate to near relatives, none of which were, however, placed upon record till the day before the assignment, and various payments of money were made, during the same time, to relatives, on alleged indebtedness. After these transactions, and with a full knowledge of their impending failure, a meeting with their legal advisers was arranged for the evening of October 31, for the purpose of determining the measures to be adopted, and the shape their failure was to assume. The meeting took place, and the determination was then formed to make a voluntary assignment, and to prefer the banks by giving them judgment notes.

The right of a failing debtor to sell his property for a valuable consideration, to mortgage his property as security for a *bona fide* indebtedness, and in the disposition of his property to prefer one or more creditors, to the extent of the *bona fide* indebtedness, has been recognized in this State; but since the Voluntary Assignment act of 1877, all preferences by voluntary assignment have been void. Section 13 of that act reads: "Every provision in any assignment hereafter made in this State, providing for the payment of one debt or liability in preference to another, shall be void, and all debts and liabilities within the provisions of the assignment shall be paid *pro rata* from the assets thereof." The question is, were the preferential judgments of appellees within the provisions of the voluntary assignment.

The statute is silent as to the form of the instrument or instruments by which an insolvent debtor may effect an assignment. The declaration of assignment, which is to evidence the intention to make a voluntary assignment, must, it would seem, be in writing, for it must be acknowledged and recorded in the county, and have annexed a verified inventory of the estate, and a list of creditors, etc.; but an incorrect inventory and list in no way affects the validity of the assignment, nor is the inventory conclusive as to the amount of the debtor's estate, but the "assignment shall vest in the assignee * * * the title to any other property, not exempt by law, belonging to the debtor * * * at the time of making the assignment, and comprehended within the general terms of the same." It is not contended, that here, in the single instrument declaring the debtors' intention to make a voluntary assignment of all their estate for the benefit of creditors, and which they acknowledged and recorded, an express preference was made in favor of the judgment creditors, so that if we are to be confined to the express provisions of that writing, the question would have to be resolved in the negative. If, then, these preferences are to be held to be within the "provisions" of the assignment, or "comprehended within its general terms," it must be because they fall within the intent and spirit of the act.

It will be observed, this act does not assume to interfere, in the slightest degree, with the action of a debtor while he retains the dominion of his property. Notwithstanding this act, he may now, as heretofore, in good faith sell his property, mortgage or pledge it to secure a *bona fide* debt, or create a lien upon it by operation of law, as, by confessing a judgment in favor of a *bona fide* creditor. But when he reaches the point where he is ready and determines to yield the dominion of his property, and makes an assignment for the benefit of his creditors, under the statute, this act declares that the effect of such assignment shall be the surrender

and conveyance of all his estate, not exempt by law, to his assignee,—rendering void all preferences, and bringing about the distribution of his whole estate, equally, among his *bona fide* creditors; and we hold that it is within the spirit and intent of the statute, that when the debtor has formed a determination to voluntarily dispose of his whole estate, and has entered upon that determination, it is immaterial into how many parts the performance or execution of his determination may be broken,—the law will regard all his acts, having for their object and effect the disposition of his estate, as parts of a single transaction; and on the execution of the formal assignment, it will, under the statute, draw to it, and the law will regard as embraced within its provisions all prior acts of the debtor having for their object and purpose the voluntary transfer or disposition of his estate to or for creditors; and if any preferences are shown to have been made or given by the debtor to one creditor over another in such disposition of his estate, full effect will be given the assignment, and such preferences will, in a court of equity, be declared void, and set aside, as in fraud of the statute.

The application of the law, as thus interpreted, to the facts of this case, is not difficult. The debtors, conscious of their hopeless insolvency, and determined to make disposition of their whole estate to and for their creditors, entered upon the execution and performance thereof. Claiming to be indebted to some of their immediate relatives, they made preferential payments and conveyances of real estate directly to such relatives in satisfaction of such alleged indebtedness; and then, with one hand, they proceeded to make and deliver a series of judgment notes, for the avowed purpose of preferring certain of their creditors, among whom were appellants, and, with the other hand, made a deed of assignment for the benefit of creditors generally, in form free from legal defect. Both these operations,—the making and delivering of the judgment notes and the preparation of the deed of assignment,—are shown

to have been carried on at one and the same time by different members of the debtor firm; but so skillfully timed were these different steps, that the favored creditors had just sufficient time to take their judgment notes into the different courts in Chicago, and there have judgments entered thereon, and executions issued, and placed in the hands of the executing officers, to perfect a lien upon personal property of the debtors, before the deed of assignment was placed on file; and then, before the assignee could qualify, and take possession of the assigned estate, the officers holding the executions took the great bulk of the debtors' estate into possession.

It will be observed, that all this was strictly in accordance with the *forms* of law, but will any one deny that a most palpable fraud was, in fact, perpetrated upon appellee, Spaulding, by the debtors, or that the acts of the debtors were in fraud of the statute? The one article of lumber in the possession of the debtors at the moment the preferential judgments were rendered, according to the debtors' own estimate, was worth, or perhaps had cost, $125,000, and every foot of this lumber had been sold and delivered to them by Spaulding; and yet, if these judgments are to stand, he can reach no foot of it. But if this fact be pressed aside, can it be possible that insolvent debtors, under such circumstances, can, by any act or acts of theirs, render wholly nugatory and inoperative this statute guaranteeing equality among creditors? Most certainly not. This Voluntary Assignment act is, in its character, remedial, and must, therefore, be liberally construed, and no insolvent debtor, having in view the disposition of his estate, can be permitted to defeat its operation by effecting unequal distribution of his estate by means of an assignment, and any other shift or artifice under the forms of law; and whatever obstacles might be encountered in other courts of this State, (and of this we shall speak hereafter,) a court of equity, when properly invoked, was bound to look through and beyond the *form*, and have regard to the substance, and having done so,

to find and declare these preferential judgments void, under the statute, and to set them aside.

But it is said, that although the action of the debtors in giving the judgment notes, and thus placing appellants in a position to acquire a preference over other creditors, may have been in fraud of the Voluntary Assignment act, the appellants themselves are guiltless of any wrong, and having, without any evil intent or wrongdoing, and without violating any moral obligation or broken any law, been placed in a favored position, they ought, in good conscience, to be left where the law finds them. To this it must be answered, that while the law favors the diligent creditor, the favored position in which appellants were placed was the result of no diligence on their part. If Hair & Odiorne were insolvent, and contemplated assignment, appellants were ignorant of it. The original (as distinguished from the judgment) notes held by appellants were not yet due, and it is not shown that any one of appellants was at all apprehensive that the notes they held would not be paid as they should mature. They were not in a position to demand payment of their notes, and no one of them had even asked security. The change, then, in the position of appellants, was brought about by the debtors alone. Without disclosing to appellants their object or intention, the debtors, of their own volition, prepared a series of notes corresponding in date and amount with the notes already held by appellants, and attached thereto warrants of attorney authorizing immediate judgment; and these notes were presented and accepted by appellants. It is a misapprehension to suppose that this Voluntary Assignment act attempts to regulate the conduct of creditors. What it does, is to regulate the conduct of the debtor, and declare void preferences made or given by him in an assignment of his estate.

The principles here announced find support in the following authorities: In *Berry* v. *Cutts*, 42 Maine, 445, the statute provided, that assignments made by debtors for the benefit

of creditors should provide for an equal distribution of all their estate among such of their creditors as, after notice, became parties to the assignment, in proportion to the amount of their respective claims. An insolvent debtor made mortgages of portions of his property to particular creditors, and within two days executed a voluntary assignment. In construing this statute, it was said: "When, therefore, a debtor, in contemplation of an assignment under this act, shall determine upon a distribution of his estate among his creditors, and in execution of such contemplated assignment and determination, and for the purpose of giving a preference to one class of creditors over another class, shall transfer to such preferred class distinct portions of his estate, and then assign the residue thereof to his general creditors, though the different instruments may not bear the same date or be executed at the same point of time, if they are executed in pursuance of an original design, contemplated and determined upon in the beginning, they will be deemed, in law, one transaction,—a transaction consisting of a series of acts intended to produce one result, to-wit, the distribution of the debtor's estate among his creditors. If, therefore, the transaction, when fully executed as originally contemplated and determined upon, does not make an equal distribution of such estate among all creditors, in proportion of their claims, it is not in conformity with the statute, and must be deemed in fraud of its provisions."

In *Holt* v. *Bancroft*, 30 Ala. 193, the statute was: "Every general assignment made by a debtor, by which a preference or priority of payment is given to one or more creditors over the remaining creditors of the grantor, shall be and inure to the benefit of all the creditors of the grantor, equally." A mercantile firm being insolvent, made a deed of trust on May 9, on one-third of their stock, to secure one of their creditors. At the time, they intended to make a general assignment of all their effects for the benefit of their creditors, and so informed the trustee, but not the *cestui que trust*. May 17, they

conveyed the residue of their effects to another trustee, for the benefit of all creditors. Bill was filed by a creditor, alleging the first deed a preference, and part and parcel of the second, and therefore void. The second deed was conceded, on argument, to be, in effect, a general assignment. The court said: "The object of the statute was to prohibit all discrimination by a debtor making a general assignment, in favor of any of his creditors. * * * It is evident that if a party, having determined to make a general assignment of all his property, can anticipate by making partial assignments for the benefit of particular friends, the law can be effectually set at defiance, and might as well never have been enacted. Its policy of preventing preferences in general assignments would be incapable of accomplishment, and the statute itself, inviting to its evasion by the facility of accomplishing the object, would be a dead letter. In truth, if one intending to make a conveyance of all his property for the benefit of his creditors, convey a part one day, a part the next, and so proceed until all his property is appropriated according to the original intention, precisely the same end is accomplished as if a general assignment had been made at the outset; and the law must visit the same penalty upon preferences in an assignment accomplished by these successive acts, as if it had been done by a single deed."

In *Kellogg* v. *Root,* (U. S. Cir. Ct. W. D. Mich,) 23 Fed. Rep. 525, after discussing the question arising under the statute of Michigan, which declared that all common law assignments for the benefit of creditors should be void unless the same was without preferences as between creditors, and when, on the 10th of March, the debtor made two chattel mortgages on her stock of goods to secure two of her creditors, but without the knowledge of the two creditors, and held the same till the 17th of the same month, before filing the mortgages the debtor had caused to be prepared a general assignment for the benefit of creditors, and within two hours after filing

the mortgages the general assignment was executed, delivered to the assignee, and he put in possession of the assigned property, the court says: "The case at bar was not one where a diligent creditor was present, and pressing for security from his insolvent debtor. I do not question, in view of the decisions by the Supreme Court of Michigan, the right of a creditor to take security, by mortgage or otherwise, from his insolvent debtor, with knowledge of his financial weakness, so long as the creditor has no notice or knowledge that the debtor contemplates making an assignment; but the security must be given at the instance of the creditor, be duly delivered, and he must have no notice or knowledge of any fraudulent purpose, within the meaning of the statute. When an insolvent, at his own instance and convenience, voluntarily gives his creditor security, it is at once a suspicious circumstance, and if followed within a short time by an assignment, the conclusion will be justified, in the absence of other controlling circumstances, that both were contemplated, and should be deemed, in law, one transaction." See, also, *Burrows* v. *Lehndorff*, 8 Iowa, 96; *Van Patten* v. *Marks*, 52 id. 518; *Perry* v. *Holden*, 22 Pick. 269; *Livermore* v. *McNair*, 34 N. J. Eq. 478; *Hahn* v. *Salmon*, 20 Fed. Rep. 801; *Doggett* v. *Herman*, 5 McCrary, 269; *United States* v. *Griswold*, 8 Fed. Rep. 496.

Our attention has been called to a class of cases where a different construction has been placed upon similar statutes. For example, *Gumersell* v. *Hanbloon*, decided in November, 1885, by the Court of Appeals of Missouri. The case can not be regarded as authority, for, as appears by comparison of the Missouri statute with our own, their statute contains no provision corresponding with that in our statute, viz., that the effect of the assignment shall be to vest in the assignee title to any other property not described in the assignment, not exempt by law, belonging to the debtor at the time, and comprehended within the general terms of the same. In

*Lake Shore Banking Co.* v. *Fuller,* decided in October, 1885, by the Supreme Court of Pennsylvania, the court found, that although one day the debtor confessed judgments, and the next day made an assignment, the judgments were no part of the assignment, for the reason, as we understand, that the court found, that at the time the debtor confessed the judgments he had no intention of making a general assignment. Without extending the reference, the cases referred to do not, in our judgment, weaken the force of the views we have expressed in construing the statute of this State.

The further contention by appellee Spaulding is, that he is entitled to rescission as to all the lumber sold and delivered by him to Hair & Odiorne under the contract of May 5, 1882, or any extension thereof, upon the ground that he was induced to enter into that contract, and afterwards to extend its terms, by the false and fraudulent representations of Hair & Odiorne in respect of their financial condition and standing, and which false representations he believed and relied upon during all the time he was, on his part, fulfilling that contract. An extended discussion of the evidence will subserve no good purpose, but it is shown that Hair & Odiorne made seven statements to Spaulding, purporting to be an exhibit of their financial standing and condition; but those chiefly relied upon as furnishing grounds for rescission, are those of February 1, April 1, and June 1, 1882.

By the statement of February 1, 1882, the assets of Hair & Odiorne appeared to exceed their liabilities by $62,871.50; by that of April 1, 1882, by $62,918; and by that of June 1, 1882, by some $59,144.74. Hair & Odiorne deny that the statement of February 1, 1882, was made with a view to the contract that was entered into May 5, and assert that it had relation to the extension of the time of payment of their notes for $178,522.68, then held by Spaulding, and representing the unpaid portion of their purchases from him the preceding year. The record shows, beyond question, that the statements

of February 1, April 1 and June 1, 1882, were not true state-
ments of the financial condition of Hair & Odiorne, in that
they wholly failed to disclose and show a large indebtedness
of Hair & Odiorne to appellants and other banks in Chicago,
and the confidential indebtedness to relatives; and also, that
in September, Hair & Odiorne knew they were insolvent, and
that when they procured and induced Spaulding to deliver,
at the price stipulated in the contract of May 5, the last
3,572,869 feet of lumber, and the 709,350 pieces of lath he
delivered to them, they knew they were without the ability,
and had no intention, of paying for the same. Spaulding
charges, and the proof tends strongly to show, that, relying
upon the truth of the statements of Hair & Odiorne, and be-
lieving them to be true, between May 13 and September 25
he had delivered, under the contract as extended, 12,127,645,
feet of lumber at the contract price; that then Hair & Odiorne
claimed he had agreed to extend the contract of May 5, 1882,
so as to include 14,000,000 feet of lumber, and, while denying
that he had so agreed, nevertheless he did go on and deliver
after that time, and before and including October 31, 3,572,-
869 feet of lumber and 709,350 pieces of lath at the contract
price. The record further shows, that early in the season of
1882, Hair & Odiorne began discounting with appellants, and
others, notes taken by them for sales of lumber, their own
notes, drafts and acceptances; that the general time of the
paper discounted was ninety days; that these transactions
continued down to a few days prior to their failure; and that
at the time of their failure, November 1, 1882, appellants,
and others spoken of before herein as the judgment creditors,
held the undue paper of Hair & Odiorne to the amount of
$90,413.17, and their paper held by Spaulding amounted to
$246,963.80; that at the opening of the season of 1882, Hair
& Odiorne had on hand, of their last year's stock, lumber of
the approximate value of $113,456, and that between May 13
and the latter part of September, Spaulding sold and placed

15—120 ILL.

in their possession, as apparent owners thereof, 12,127,645 feet of lumber, representing in value a very large sum; and there is nothing in the record showing or tending to show that the banks representing this $90,413.17 had any notice or knowledge of the false statements Hair & Odiorne had made to Spaulding, or that Hair & Odiorne had procured the large amount of personal property in their possession, and over which they had complete dominion as owners, and on the faith of which ownership they had extended credit to Hair & Odiorne, in any illegal or improper manner. But it does appear that with respect to at least two of these creditors the condition of Hair & Odiorne had been the subject of conference with Spaulding. Henry F. Eames testifies, that during 1882 he had a conversation with Spaulding as to the condition of Hair & Odiorne, in which Spaulding said he knew about their situation and condition, and that they were good, and solvent financially. George L. Otis testifies, that Spaulding knew that Hair & Odiorne were customers of the Commercial Bank, and that a portion of the money procured by Hair & Odiorne of the bank, went to pay Hair & Odiorne's notes held by Spaulding. L. A. Carton testifies, that before he began loaning money to Hair & Odiorne, he asked Spaulding about them, when Spaulding said they were all right, and that he relied and acted on that information. Spaulding knew, at the opening of the season of 1882, that the lumber on hand belonging to Hair & Odiorne amounted to only $113,456, and that they were indebted to him, Spaulding, in a sum exceeding $178,000, of which appellants were wholly ignorant, and the statements of Spaulding were made with knowledge that appellants were discounting the paper of Hair & Odiorne. He had been advised by Mr. Eames, as early as the preceding November, that said firm was indebted to one of said banks over $15,000, and he knew that at least some of the money paid by Hair & Odiorne to him on their old and new indebtedness, was obtained by discounts of their paper at these

banks. The payments by Hair & Odiorne to Spaulding had aggregated a very large sum of money.

The fundamental principle upon which the doctrine of rescission of sales for fraud rests, is, that the contract of sale is vitiated by the fraud. But the accepted doctrine now is, that the contract, although so tainted with fraud as that rescission for that reason may be available to the vendor, is not thereby rendered absolutely void, but only voidable, and hence it is that the vendor, after knowledge of the fraud, may affirm the sale notwithstanding the fraud. (Benjamin on Sales, sec. 433.) The general rule is, that, as between the vendor and vendee, the vendor may disaffirm the sale and have rescission, after notice of the fraud, and recover back his property, if still in the hands of his vendee, or the value of it; but if he lie by, after notice, till the rights of innocent third parties intervene, his right of rescission is gone, or is postponed to the rights of such third parties. (Ibid.; *Henshaw* v. *Bryant*, 4 Scam. 97; *Allen* v. *Hart*, 72 Ill. 104.) And it is also the law, that the vendor is put to his election to affirm or disaffirm the sale promptly, when knowledge of the fraud comes to him. And further, as said by this court in *Jennings* v. *Gage*, 13 Ill. 612: "It is a rule that a party can not rescind a contract, and at the same time retain the consideration, in whole or in part, which he has received under it. He must rescind the contract *in toto*, or not at all."

Two questions arise: First, has Spaulding, the vendor, shown a case by his bill, and proofs thereunder, entitling him to rescission of the contract of May 5, 1882, or any part of it, as against Hair & Odiorne; and second, if he has such right as against his vendees, are appellants, and those in relation with them, innocent third parties whose interests will be protected in equity, and which can be said to have intervened to prevent the right of rescission by Spaulding.

We are of opinion that Spaulding, by his bill and the proofs thereunder, did make such a case as that, but for the existence

of other controlling facts and circumstances referred to and involving the rights of innocent third parties, the complainant might have had rescission as to all the lumber remaining in the hands of his vendees, and undisposed of. As between vendor and vendee, a court of equity would not deny the vendor rescission of contract for the reason the vendee had, by his disposition of a part of the property fraudulently purchased, made it impossible for the parties to be placed *in statu quo*. If the vendee retained all the purchased property, the rule of law would apply—the rescission must be complete; but to the extent the fraudulent vendee had disposed of or incumbered the purchased property to third parties without notice, the vendor claiming rescission would be excused from refunding or offering to refund that part of the consideration received, representing or equaling the portion of the property disposed of or incumbered by the vendee.

As to the second inquiry, we hold, that in view of all the facts and circumstances of this case, and the attitude and relation of the respective parties towards each other, the appellants, and those standing in relation with them, are, in equity, innocent third parties, whose rights, in respect of the property sold and delivered by Spaulding under the contract of May 5 and its first extension of June 1, has intervened, and must, in a court of equity, be protected, as against Spaulding's right of rescission,—not because they had acquired a lien by virtue of their judgments, but because, through a course of dealing extending over a period of five years, Spaulding had, by his conduct, held these vendees out as worthy of credit, and when, under the contract of May 5, and the extension of June 1, 1882, he placed in their possession, as purchasers and owners, 12,127,645 feet of lumber, as shown in this record, he, in legal effect, said to appellants and those in relation with them, "You may deal with these men on the faith of the property they own and possess," and it is evident they did so deal with them, and on the faith thereof; and because in

respect of the representations as to the financial condition of Hair & Odiorne, made by Spaulding, who had profited by the transactions with appellants, and had it in his power, at any time after the contract of May 5 was made, by the exercise of ordinary diligence, to verify the truth or falsity of those statements, which he neglected to do, but which he should have done, knowing, as he must have known, that their indebtedness to him exceeded the value of their stock.

It is a familiar principle, that where one of two innocent persons must suffer through the fraud of a third, that one should suffer who, by his conduct, made the fraud possible. The equities of these creditors must therefore be held to be at least equal to the equities of Spaulding; but with respect to so much of the lumber as was delivered by Spaulding in excess of the 12,127,645 feet, his right of rescission must be sustained. At the time he was induced by Hair & Odiorne to extend his deliveries beyond that amount, they knew they were insolvent, and it sufficiently appears that they did not intend to pay him for any lumber he might thereafter deliver. And although some of the paper of Hair & Odiorne held by appellants at the time of the failure, bears date after October 1, we are not satisfied that the lumber delivered under what we have called the last extension of the contract of May 5, was the basis of the credit appellants then appeared to extend to Hair & Odiorne.

An injunction issued in this case, restraining the sheriff from selling the property levied upon under executions issued on the judgments by confession, and on February 12, 1883, T. W. Harvey was appointed receiver, under an order directing him to take possession of the stock of lumber and other property of Hair & Odiorne, then in possession of the sheriff, to convert the same into money, and deposit the proceeds subject to the order of the court. By the order, the rights of all parties in the property, as then existing, were to attach to the proceeds to the same extent as if the property had not been

sold.    The report of the receiver, presented in June, 1883, showed the property coming to his hands, and the proceeds of the sale of the same, amounted to $64,141.53; that he received the further sum of $5992.39 from the United States marshal, being the excess realized by him above the sum required to satisfy the judgment rendered in the United States court in favor of the National Bank of Illinois, upon which a sale of a portion of the assets had been made. Freshwater resigned as assignee in October, 1883, and the next month Robert E. Jenkins was appointed assignee by the county court, and in January, 1884, he withdrew the demurrer to the bill that his predecessor had interposed, answered, and filed his cross-bill, wherein he set up, substantially, the same facts as to the said judgments that Spaulding had done in his original bill, but denied Spaulding's right to rescind, and, as assignee, claimed the right of possession as to all the unsold property of Hair & Odiorne at the time of their assignment, and to have the proceeds in the hands of the receiver paid over to him, as assignee, to be distributed under the orders of the county court.    By the decree of the circuit court, the said judgments by confession, and execution liens, were declared illegal and void as to Spaulding.    Spaulding's right to rescind as to the lumber, etc., sold and delivered prior to September 30, 1882, was denied, but as to that delivered after that date his right of rescission was affirmed, and the funds in the hands of the receiver representing the same, to be paid to Spaulding, and the remainder of that fund was directed to be paid to Jenkins, as assignee.    But in order that what may hereafter be said may be understood, it must be further stated, that appellants, judgment creditors, relying on their judgment liens, and the state of the law as then generally understood, did not exhibit their demands against the estate of Hair & Odiorne before the assignee within the ninety days following his publication of notice, as required by the statute; nor do we learn from the record that they did so at any subsequent

time.    Spaulding, however, filed his claim with the assignee within the statutory time.

If, therefore, the decree of the circuit court directing the residue of the fund in the hands of the receiver to be turned over to the assignee, is to stand, and the ninety days' limitation is to be applied in the county court to appellants' claims, as must be the case in that court, it is manifest the practical effect will be, that under the decree of the circuit court Spaulding will take of the funds in the hands of the receiver so much as represents his right of rescission, and under the order of the county court he will take not only the assets coming to the hands of the assignee outside of the fund in the hands of the receiver, but also all the latter fund that may be paid by the receiver to the assignee, and these appellants, whose equities as to so much of the fund in the hands of the receiver as represents lumber, etc., received by Hair & Odiorne prior to September 30, we have found were equal to the equities of Spaulding, and who, we have also seen, were without fault, would take nothing.    No part of these assets had been reduced to possession by the assignee, nor was he seeking to do so.  The United States marshal had already sold a part, and the sheriff had the remaining portion advertised for sale. Before the assignee had qualified, or could have qualified, these assets were seized under legal process issued out of courts of competent jurisdiction, and were in the hands of the law.  When appellees' bill was filed, the county court had not, nor has it since that time, acquired jurisdiction of the *res.*    On the contrary, as the result of this bill and the proceedings under it, and against the objection of the assignee, the circuit court, in a case where it had jurisdiction, reached out its arm and seized the *res*, put the same into the possession of its own officer, the receiver, and continued to hold the same until final decree.

It is a misapprehension to suppose, as counsel do, that the case under consideration, in its facts and controlling princi-

ples, at all resembles *Freydendall* v. *Baldwin*, 103 Ill. 325,
and *Hanchett* v. *Waterbury*, 115 id. 220. In both those cases
the assets of the insolvent were in the hands of the assignee
and within the jurisdiction of the county court, while in this
case, the assets that are the subject of contention have not
yet been reduced to possession by the assignee or brought
within the jurisdiction of the county court. These cases were
intended to hold, and properly, that when a voluntary assign-
ment is made, under the statute, and the property assigned
has passed into the possession of the assignee, such property
is thereby brought within the jurisdiction and under the ad-
ministrative control of the county court, and that the county
court is vested with ample power and jurisdiction, concurrent
in dignity with any other court, to direct and control the dis-
position to be made of such property under the statute, and,
in doing so, to adjudicate upon the conflicting legal rights of
claimants therefor, arising in that court. But these cases are
not to be understood as holding that the county court is by
this Voluntary Assignment act invested with general chancery
powers and jurisdiction,—such, for example, as was invoked
by complainants' bill in this case, or as would be invoked on
bill for specific performance, for removing cloud from title,
and the like, although the property assigned might be therein
involved; for, in respect of matters of a purely equitable char-
acter, specially cognizable in courts of equity, resort must
still be had to the courts of general chancery jurisdiction.
There is nothing in the statute, nor in the cases referred to,
at all inconsistent with the right and duty of the assignee to
go into any court of competent jurisdiction and there seek
to recover, and bring into his possession, and so under the
jurisdiction of the county court, the property of his assignor
embraced in the assignment,—and no court will deny him
this right in any proper case. But when he comes into a
court of chancery, as in this case, and asks that court to sur-
render to him, and thereby turn over to the jurisdiction of

the county court, to be by that court disposed of according to the strict forms of law, property or a fund held by such court, and which has never been in the possession of such assignee, to which the parties before the court have shown a clear, equitable right, which the county court, hampered by the strict rules of the law, could not distribute so as that the parties shown to be equitably entitled thereto could share in its disposition, a court of equity may well refuse his application, and retain the fund in its own hands, and distribute it as the equitable rights of the parties may require.

The circuit court, the Appellate Court, and now this court, have all felt called upon to deny complainants' right of rescission, upon the sole ground of the equities of appellees, and those in relation with them; and now, after the harmonious conclusion of these courts, that we should send appellants to the county court, where, with no power in that court to prevent the application of the bar of the statute, they must be denied all relief, instead of directing the administration of the fund in the hands of the court, where appellants can receive what is equitably theirs, seems to us inequitable, and we can not give our assent thereto. Courts of equity, when once they have properly acquired jurisdiction of the person and property, will not surrender their jurisdiction, if equity requires its retention, but will distribute the fund under their control as the equities of the case may require. In *Kellogg* v. *Root*, 23 Fed. Rep. 525, the mortgagees, whose mortgages were held fraudulent preferences, within the meaning of the Michigan statute, and who would have been cut off by a statutory limitation of twenty days, were, by the court, placed on an equality with the creditors who had proved their claims within the statutory time, and allowed to share ratably in the funds,—proceeds of the estate. We therefore hold, that appellants are entitled to share ratably with appellee Spaulding in the distribution of so much of the fund in the control of

the circuit court as was not specially decreed to Spaulding under his right of rescission.

The judgment of the Appellate Court and the decree of the circuit court are in all things affirmed, except as to the order of the circuit court directing payment to the assignee, Jenkins, of a part of the fund in the hands of the receiver, and as to such order the said judgment of the Appellate Court and decree of the circuit court are reversed, and this cause is remanded to the circuit court, with directions to cause an account to be taken of the amounts of the judgments of appellants, and of the amount of the claim of appellee Spaulding, as at the time of the filing of the original bill in this case; that from the amount of the claim of said Spaulding there be deducted such sum as may have been decreed to him on account of rescission of contract, and that the fund in the hands of the receiver, less the costs in the circuit court, to be first paid therefrom, be then distributed ratably between appellants and said Spaulding.

*Judgment reversed in part and in part affirmed.*