# CHICAGO STAMPING COMPANY ET AL.
## v.
## SETH F. HANCHETT ET AL.

*Voluntary Assignments—Preferences—Judgment Notes—Whether Valid —Fraud—Burden of Proof.*

1. Fraud will not be presumed, but must be proved; it will not be inferred where the acts charged as fraudulent can be fairly accounted for consistently with all the evidence as done in good faith and for an honest purpose.

2. The burden of proof in cases arising out of assignments, is on him who alleges that a preference given to a creditor is fraudulent.

3. Preferences given by a debtor before he has formed the determination to make an assignment for the benefit of his creditors, are valid.

4. A debtor may place certain of his creditors in a position where they may gain a preference by giving them judgment notes, unless he does it in contemplation and as part of a general assignment.

5.   In the case presented, it is *held:*  That the complainants have failed to show that the judgment notes in question were given after the debtor had determined to make an assignment, or that they were given in preparation for, or as part of, an assignment in contemplation by him, or which he might thereafter be compelled to make.

[Opinion filed January 11, 1888.]

APPEAL from the Circuit Court of Cook County; the Hon. MURRAY F. TULEY, Judge, presiding.

Messrs. FREDERICK ULLMAN, R. S. THOMPSON, TENNEY, BASHFORD & TENNEY and McCLELLAN & CUMMINS, for appellants.

Messrs. H. T. & L. HELM, for appellees.

MORAN, P. J.   The bill in this case was filed by appellants, who are creditors of one Merrick A. Richardson, to have three certain judgments entered by confession set aside as being attempted preferences given in an assignment for the benefit of creditors.   Richardson made an assignment October 5, 1885. On the same day and a short time before the filing of the assignment in the County Court, the judgments here attacked were entered and a levy made under executions issued thereon upon the property of said Richardson.   One of said judgments was in favor of appellee Beldam for the sum of $13,578.67; one in favor of appellee Warren L. Aborn, for $7,581.60, and one in favor of appellee Everett A. Aborn for $2,559.57.

The master, to whom the case was duly preferred, reported that the said judgments were not preferences given so as to constitute part of the assignment; that they were valid as against the assignee and the complainants, and that appellees were entitled to the lien of their executions which was prior to the execution of the assignment.

The case was heard on exceptions to the master's report and the exceptions were overruled and a decree entered, ordering the proceeds of the sale of the property of Richardson (which sale had been made by a receiver under an order of the court

entered pending the final hearing of the case) to be paid over and applied *pro rata* on the executions of appellees, the amount of the proceeds not equaling the aggregate of appellees' judgments.

From that decree this appeal is prosecuted and it is strenuously contended that the judgment notes were given under circumstances that clearly show an intention on the part of Richardson to assign his property for the benefit of his creditors, but to so dispose of it as to create a preference in favor of appellees. That the giving of the notes and the making of the assignments were, in fact, but parts of the one act of assigning his property, and that the judgments entered on the notes are void as constituting preferences in the assignment, under the rule as laid down in the case of Preston v. Spaulding, 120 Ill. 208.

The evidence, which is voluminous, establishes the following facts: Richardson was a hardware dealer in the City of Chicago, the two Aborns were his nephews and were in his employ as clerks or salesmen, in his said business, and Beldam was a friend who had loaned him money on his note. On October 1, 1885, the agent of Sidney Shepard & Company, who were creditors of Richardson, came to his store and, stating to him that there were bad rumors on the street as to his (Richardson's) condition, insisted that the amount of a bill due his firm should be paid at once. Richardson did not have the money at hand and was persuaded to assign to said Sidney Shepard & Company sufficient of the accounts standing on his books against customers to pay their debt. After having done so Richardson became alarmed as to the effect such act would have upon his other creditors and, after a consultation with his attorney, he went to appellee Beldam to see if he could not borrow some more money from him to purchase the accounts which he had transferred to Shepard & Company. Beldam agreed to let him know that evening. In the evening the two Aborns, Beldam and Richardson met at Richardson's store.

In a conversation between Beldam and the Aborns it was ascertained that Richardson's indebtedness was larger than was

Chicago Stamping Co. v. Hanchett.

theretofore supposed by them, and they, being alarmed for their claims, agreed between themselves to stick together and endeavor to get security from Richardson.

They each held notes against Richardson but none of said notes were due, and they argued with him that his situation was dangerous, and argued that he ought to take up the notes which they held, and give them demand notes for the amount of their respective claims.

After offering some objections, Richardson consented to do this, and the amount due to each of the Aborns, in part for borrowed money and in part for salary, was figured up and the old notes which they held were given up and demand notes taken by them. Beldam, not having his notes with him, did not then get his demand note, though it was agreed that he was to have one, as all three were to be served alike.

Then a discussion arose as to security. Richardson insisted that he was all right, that he had more than enough money coming in to pay his bills as they matured, and undertook to satisfy them from his books that such was the fact. They asked him for a bill of sale or a chattel mortgage on the hardware stock, but he said he could not do that as it would come out in Bradstreet's reports and would be known to the trade. They said they would not put the bill of sale on record, they only wanted security and they would not make him trouble, but he declined.

They urged him to turn over book accounts to them as he had done to Sidney Shepard, but he refused. One of the Aborns then threatened to attach the stock, and then ensued further discussion about security. Richardson went to see his lawyer to see what could be done, and while he was absent Beldam suggested that they obtain the signature of Richardson's wife, who was the owner of real estate, to the demand note, and this was thought well of by the two Aborns, and upon Richardson's return to the store was proposed to him and he assented to the plan, but still insisted that he was in a safe condition and could pay them in full in sixty days. It was agreed that he should get his wife's signature to the notes, and that he would send a note so secured to Beldam the next

morning if his wife would sign. The parties then separated, the two Aborns going home with Richardson with whom they lived.

Richardson consulted his wife that night about signing the notes and she refused, and that fact was communicated to Warren L. Aborn before he went to bed, and he told Richardson, with some show of temper, that he had loaned him nearly all the money he had in the world, and asked if he would rather pay Sidney Shepard and the other fellows and leave him out; Richardson answered that he would pay everything, and said that Ball, his attorney, had said that a chattel mortgage on the stock would be good for nothing if not put on record, but that a way could be fixed to secure them (meaning the two Aborns and Beldam), if they would keep still. And Aborn replied that he would keep still if they got security.

The next morning the Aborns started out to collect bills so as to get money to pay the Shepard debt so that Richardson's credit might not be injured by its becoming known that he had signed over accounts.

It was understood between the Aborns and Richardson where they would meet during the day, and in the afternoon Richardson delivered to each of them a judgment note and received from each the demand note which had been given the night before. Richardson also delivered to Beldam a judgment note for the amount due him, and took up the note which Beldam held. The Aborns and Beldam met toward evening and discussed the matter of security which they had received, and not understanding it clearly, went together to a lawyer who had done business for Beldam, and after consulting with him concluded to have judgments entered on the notes. It was then Saturday evening and too late to enter judgment that night, so the papers were prepared and the judgments entered before ten o'clock on Monday morning. On the same day, and about forty minutes after the executions were levied on the stock, Richardson's assignment was filed in the County Court.

The schedules attached to the assignment were in part writ-

Chicago Stamping Co. v. Hanchett.

ten by the Aborns on Friday and Saturday nights and on
Sunday afternoon, and were finished by Richardson's clerk
Monday morning after the Sheriff took possession of the
stock. The portion of the schedule which was written by
the Aborns were the lists of debts or accounts due to Rich-
ardson, and they swear that the portion of them made out on
Friday night were for Richardson's purpose in attempting to
demonstrate to the Aborns and Beldam that he could pull
through and overcome his embarrassment, and Richardson
testifies that the list was commenced for that purpose and that
he continued it on Saturday and Sunday, because Ball told
him to get his accounts in shape so he could show what he
owed, and what was owing to him.

It is very manifest that appellees were, from the time they
first learned of Richardson's precarious condition, determined
to secure their debts, if possible.

The two Aborns were conversant with the business and ap-
peared to have understood the nature and value of the stock
on hand, and the probability of collecting the outstanding
debts better than Richardson himself.

All the appellees in interest (Hanchett is a nominal par-
ty) were friends of Richardson, had loaned him large amounts
of money, and would no doubt have been glad to see him con-
tinue his business if he could secure them, but they were
alarmed, and regarding themselves as entitled to advantages
over other creditors, they determined to obtain such advan-
tages if they could.

There is nothing wrong in a creditor's availing himself of a
disposition on the part of the debtor to favor him, though he
may know that other persons that have the same rights with
himself, may be less vigilant or less fortunate. Neither is
there anything wrong, as the law now stands, in a debtor's de-
siring that one or more of his creditors shall have their pay
before others, or in placing them, by means of a judgment
note or other form of security, in a position where they may
gain a preference.

It is only "when he reaches the point where he is ready
and determines to yield the dominion of his property, and

makes an assignment for the benefit of his creditors under the statute, * * * when a debtor has formed a determination to voluntarily dispose of his whole estate, and has entered upon that determination," that the law will regard all his acts, having for their object and effect the disposition of his estate, as part of the assignment, and will hold preferences given, as in fraud of the statute regulating voluntary assignments. Preston v. Spaulding, *supra*.

The act of giving to a creditor a warrant of attorney to confess judgment, shortly before the execution of an assignment and at a time when it may be inferred that the debtor looked forward to the making of an assignment as a possible or even probable result of continued embarrassment in his business or pressure by his creditors, must have a different color and effect, in the view of a court of equity when it is given *bona fide* at the creditor's request persistently and urgently enforced, by whatever argument the creditor may find most effective to secure the desired advantage.

The law favors the diligent creditor, and it can not here be answered, as it was in Preston v. Spaulding, that the favored position in which the creditors were placed, was the result of no diligence on their part.

The creditors all swear that they had no knowledge that the debtor contemplated making an assignment; that the matter of an assignment was not spoken of at all, and that what they feared were suits or attachments by some one of the other creditors. It is true that there may be collusion between debtors and favored creditors to defeat the object of the statute, and that the form of such collusion or artifice may be as varied, elusive and impossible of definition, as fraud in general, yet the rule remains that fraud will not be presumed but must be proved, and that it will not be inferred where the acts charged as fraudulent can be fairly accounted for consistently with all the evidence as done in good faith, and for an honest purpose. Mey v. Gulliman, 105 Ill. 272.

The fact that the Voluntary Assignment Act is remedial and to be liberally construed to effect the legislative intent, does not change the burden of proof in cases arising out of as-

signments, and the *onus* is on him who alleges that a preference given to a creditor is in fraud of the law, to prove it, and not on the debtor or preferred creditor to show that it was given in good faith. It is forcibly contended that there are circumstances here in evidence which clearly show that Richardson contemplated making an assignment at the time he delivered the judgment notes to the appellee.

Those chiefly relied on are the fact that Richardson declares in his evidence, that he thought these appellees were entitled to preference over his merchandise creditors, and that he wished them to have such preference; that the making of lists of debts due to Richardson was commenced on Friday night, and the making of such lists both of debts and of his creditors, continued on Saturday night and on Sunday, the work being done by the Aborns, and that these lists were afterward attached as schedules to his assignment when it was filed. That Richardson went to the house of Roche, to whom he afterward assigned, on Sunday night, and asked him to call at Ball's office on Monday morning, and that the assignment was completed and filed so quickly after entry of the judgment, and the levy of the executions, as to show that it was in part prepared before Monday morning.

It was readily admitted that these facts considered by themselves furnished strong ground for suspicion and perhaps, if unexplained, sufficient proof that the preferences were a fraud upon the Assignment Act, but when considered in connection with all the evidence in the case, we do not think they justify such a conclusion.

Richardson's admitted desire that appellees should have a preference over his other creditors is not, as we understand the evidence, an admitted intent to prefer them in the assignment, but a hope that if his creditors should come down on him, as it was feared they might, appellees should get in first and obtain from his property satisfaction of their claims. And we think that his acts in giving the demand notes, and afterward giving the judgment notes, were due in part to their pressure and in part to his own desire that they should be in a position to accomplish that end. As we have before said, this desire

was not wrong, and acts done with this motive were not illegal unless done in contemplation of, and as part of, a general assignment. As regards the preparation of lists, he swears that was done by advice of his counsel, so that he might be able to show how he stood, and the two Aborns swear that they so understood it when they made the lists, and that they did not understand the work as being a preparation for an assignment.

Richardson further testifies that when he called on Roche he said nothing about an assignment, but told him that he was in trouble and asked him to come to Ball's office, for the reason that Ball told him that he had better do so, and that he did not intend to make an assignment till, on Monday morning, he found his store in the possession of the Sheriff, and his lawyer advised him it was the best thing he could do.

Now, as to all these facts, complainants made Richardson their own witness, and, while they might not be bound by his testimony, in the sense that they would not be permitted to contradict him, yet they introduced no other witness that does contradict him, and, if his evidence is to be considered, it must be all considered; and we do not find sufficient in the acts done to satisfy us that he has sworn falsely as to the time when he determined to make an assignment for the benefit of his creditors.

It may be the just conclusion from all the evidence that he and his counsel considered that an assignment might become necessary in the happening of certain contingencies, which it was still hoped might not occur, and that steps were taken which were in the line of preparation in the event that an assignment should become necessary. These appellees had threatened him, and he feared the attack of some merchandise creditors, but he hoped by giving the security that appellees would be satisfied to let him go on and help him to meet the demands of others. Security thus given to pressing creditors in the effort to prevent their attack and render an assignment by the debtor unnecessary, can not be construed as preferences given in fraud of the law, because such creditors avail themselves of the benefit of the security, and by imme-

diate action obtain a preference, and at the same time precipi-
tate the condition which, in giving the security, the debtor
was in good faith seeking to postpone.

A mere apprehension that he may be compelled to assign
is to be distinguished from a determination to assign, and, as
we have seen, it is the acts done after he has formed the
determination to dispose of his whole estate for the benefit of
his creditors, and which are done in execution of that deter-
mination, which will be treated as part of the voluntary assign-
ment.

Appellants have, in our opinion, failed to show that the
judgment notes in question were given after the debtor had
determined to make an assignment, or that they were given
in preparation for, or as part of, an assignment in contem-
plation by him, or which he might thereafter be compelled to
make, and therefore they are not shown to have been prefer-
ences, void, as being part of the voluntary assignment executed
subsequent to the delivery of them. Preston v. Spaulding,
*supra*, and the opinion of this court in the matter of William
S. Goehegan et al., 23 Ill. App. 157.

The decree of the Circuit Court is correct, and will there-
fore be affirmed.

*Decree affirmed.*