Sweet, Dempster & Co. v. Scherber.

*Reversed in part and affirmed in part.*

## SWEET, DEMPSTER & CO. ET AL.

### V.

## PHILIP SCHERBER ET AL.

| 42 | 237 |
|----|-----|
| 53 | 366 |
| 42 | 237 |
| 186s | 535 |

*Insolvency—Bill of Sale—Assignment—Preferences.*

1.   An execution creditor gets no greater interest in the property in the hands of the execution debtor than he himself had.

2.   A deed of assignment conveys only the interest of the assignor, and no more.   An assignee simply succeeds to the assignor's title, and the same rule applies to bills of sale.

3.   Under the common law, a debtor could use up his entire property even when he was insolvent and all parties knew it, in payment of a portion of his debts to the exclusion of another portion, if done *bona fide* and under circumstances free from fraud.

4.   If a creditor, in collusion with his debtor, secures a preference by taking an assignment or sale of the debtor's property prior to the deed of assignment, and when the debtor has the intention of making such assignment, such preference will be held void under the Voluntary Assignment Act.

5.   The giving to a few of his creditors only, of a bill of sale by an insolvent, covering all his property, followed within a day or two by an assignment, is ordinarily to be looked upon as a unit and as one act; it is not necessary that such debtor should, at the time of giving such bill of sale, have formed the intention of making an assignment; it is enough if it is followed by an intention and an assignment.

6.   The Assignment Act is remedial in its nature and should be liberally construed to remedy the evils sought to be remedied.   It can not be made use of to annul its own provisions.

7. Where goods are sold for future delivery, but through mistake of the vendors are shipped at once, and the vendee refuses to receive them except to store them at vendors' risk, and notifies vendors to take them away, which vendors are intending to do when they pass into the hands of an assignee, such goods not having been mingled with other goods of the insolvent, the vendors are entitled to the proceeds of the sale of such goods from the assignee.

8. In the case presented, this court holds that independent of the Insolvent Debtors Act of 1887, and the assignment under it, the bill of sale in question can not be regarded as fraudulent as against the execution creditors; that the transaction involving the same can-not be looked upon as an absolute sale, but more in the nature of an equitable mortgage, and that the intention was to give a preference and not to defraud other claims, but that the said transfer of goods was a clear case of fraud as against the assignment law.

9. This court likewise holds that the judgment creditors who had executions entered upon their judgments, acquired no liens by virtue thereof; that the insolvent is entitled to exemptions claimed; and reverses the order of distribution, and remands the cause with directions as to the proper method of distributing the proceeds of the sale of property in hands of the insolvent when his assignment was made.

[Opinion filed December 7, 1891.]

Appeal from the County Court of Peoria County; the Hon. Lawrence W. James, Judge, presiding.

On the 1st day of August, A. D. 1889, Joseph F. Gehke was a dealer in clothing and carried on his business in the city of Peoria in two stores. Having become insolvent and unable to pay his debts, and being pressed by his creditors, on that day Wagg & Co. procured from him a power of attorney to confess judgment attached to a note long past due, and took judgment by confession thereon against Gebke in the Circuit Court of Peoria County, and had execution issued thereon and placed in the hands of the sheriff. The execution issued thereon about 1:47 o'clock, P. M.

The People's Savings Bank, composed of Kingman et al., also took two judgments in the same court; the first, August 1, 1889, and had execution issued thereon, and placed in the hands of the sheriff at 5 o'clock P. M., and the second one, August 3, 1889, which was placed in the hands of the sheriff at 9 o'clock A. M.

On the same first day of August, Gebke being informed of the intended proceedings of Wagg & Co., or suspecting it, in great haste went to Henry C. Fuller, an attorney at law in the city of Peoria, and told Fuller that he was in financial trouble—this was about 11 o'clock on the 1st of August, 1889—and gave Fuller an account of the matter, telling him about some judgment notes he had given, presumably those given to Wagg & Co., and asked Fuller what was to be done concerning those notes, and Fuller testified, "I told him the best thing to do was to give a bill of sale, which he assented to." I don't know that he thought that giving the bill of sale was the best thing, but he said he had certain creditors that he desired to protect. He wanted to protect Skinner Bros. and Klein, Detmer & Co." Fuller could not recollect all that was said and done, but says he explained to him the difference between a bill of sale and an assignment. Fuller told him that he represented J. E. Scott & Co., Klein, Detmer & Co. and Sweet, Dempster & Co., and desired to have their rights protected. He rather objected to putting in the bill of sale, J. E. Scott & Co., and Sweet, Dempster & Co. Fuller only knew about Skinner Bros.' claim from Gebke, and Fuller says, he (Fuller) did not put the amount of the consideration in the bill of sale at random, but Gebke said something that led him to believe that the stock of goods was of a sufficient amount to satisfy the bill of sale.

Fuller had no authority to represent Skinner Bros. or Tyler B. Parmley, but pretended to represent them. Gebke had a one-fourth interest in some unproductive real estate in Peoria in which his mother had a life estate, of no great value.

The so called bill of sale was then written out by Fuller, dated back to July 31, 1889, and signed by Gebke and given to Klein, Detmer & Co., Skinner Bros., J. E. Scott & Co., Sweet, Dempster & Co. and Tyler Parmley.

In form, this paper, in consideration of $3,000, in hand paid, conveyed the goods in question to said grantees, situate in two different stores in the city, describing them, and also all other property, both real and personal, of whatever kind, with covenants of warranty.

No assignee, however, was mentioned in it. Gebke then took the bill of sale, so called, and went post haste after Scherber, the assignee herein, and having found him gave him the paper and put him into possession of each store as assignee of the goods.

Possession was given to Scherber about half-past twelve o'clock, about one-half hour before the execution in favor of Wagg & Co., the one first in the hands of the sheriff, was received by him. The only evidence as to what capacity Scherber occupied in taking possession of them was given by himself and Earnest, who was a clerk in one of the stores, and was kept there as custodian under Scherber. Scherber says: "Gebke told me he had appointed me assignee, that he had made an assignment in favor of me for the creditors, and that I should take charge of the store at once." That was not the assignment, for it was the bill of sale. "It was a few minutes after one o'clock when the bill of sale was filed. I had taken possession of both stores before it was filed and paid for the filing of it. Fuller and Gebke were with me when the bill of sale was filed. I obeyed the instructions of Fuller because I thought he was the attorney of Gebke. I am sure I used the word 'assignee' when speaking to Grant Earnest, who was in charge of the upper store. I looked over the paper and did not see any name in it. I supposed if I was assignee it ought to be there. I held possession under that paper, but was not aware that it was a bill of sale."

L. G. Earnest testified that he closed the store at Fuller's request on August 1st, and handed the keys to Scherber. He understood that Fuller was Gebke's attorney, and that it was for the latter's benefit the store was closed. Fuller said "they might get out an execution against the stock, and he had better close it up." He didn't know whether Fuller said he was attorney for Gebke or not, but thought he did. Possession of the store was taken and the bill of sale recorded about half an hour before the first execution was in the hands of the sheriff. On August 3, 1889, Gebke made a regular deed of assignment under the statute with schedule of all his debts, claiming his exemptions, however, on conveying all

his property to Scherber, who was already in possession under the so called bill of sale, which was duly signed, acknowledged and recorded on the afternoon of the same day, but not until all the executions were in the hands of the sheriff. Scherber accepted under the assignment, and having possession of the goods already under the bill of sale, proceeded to administer the estate. By the order of the County Court the assignee sold the goods and held the funds realized therefrom in lieu of the stock with priority between the contesting creditors to be preserved as fully as the same then existed. The balance reported in his hands after paying out certain amounts was $1,198.95. All the creditors of the estate, including those represented in the bill of sale, and the judgment creditors, filed their claims against the estate and had them allowed. By order of the County Court, Gebke's real estate was sold and the assignee reported February 15, 1890, showing a balance in his hands of $1,404.07. Gebke had numerous creditors whose claims largely exceeded his entire estate. After the County Court took jurisdiction of the estate, all proceedings under the executions and bill of sale were suspended, and by order of the County Court their rights were preserved for future determination as their various rights and priorities might finally appear. Hunecke Bros., one of the claimants herein, and one of the appellees, through one of their traveling salesmen, made a sale of a bill of goods on July 9, 1889, to Gebke, amounting to $714, which was not to be shipped to Gebke until September 15, 1889, as provided in the order taken at the time. This order was sent to the house and by some oversight it was filled out at once and shipped on July 12, 1889. After this bill of goods had been received by Gebke on July 27, 1889, he wrote Hunecke Bros. informing them of the mistake, and refused to receive them, but informed the house he would hold them for them at their risk, and notified Hunecke Bros. that they had better take them out at once. The salesman of Hunecke Bros. also swears to the mistake, and says he was about to remove the goods when the store closed. The goods were all kept intact and none of them sold by Gebke. The latter notified the

assignee at the time he turned over the store, that those goods did not belong to him, and that they were the property of Hunecke Bros. After the assignee took possession of the goods, Hunecke Bros. asked the court to turn them over to them, claiming them as their own property; the court declined to do this, but directed the assignee to keep them separate so that the rights of Hunecke Bros. might be preserved in the final distribution of the assets. The court then directed the assignee to sell the entire stock and all property of Gebke included in the assignment, but directed that the goods claimed by Hunecke Bros. should be sold separately and a separate account kept of the proceeds, which the assignee did, and reported the amount of the proceeds of the Hunecke Bros. goods at $442.63. The different parties herein claim priority in the proceeds of these goods; Hunecke Bros. for their bill of goods taken by the assignee wrongfully as above claimed, and Gebke his exemptions; the various judgment creditors, priority in the estate of Gebke in the order of the delivery of their respective executions to the sheriff; the different claimants named in the bill of sale, priority by reason of their bill of sale and possession thereunder, and the general creditors claim a *pro rata* distribution. On a final hearing of the whole matter the County Court found:

1. That the assignor, Gebke, is entitled to his exemptions of $400, less $13.50, which he received in property out of the proceeds of the personal property in the assignee's hands.

2. That the title to the goods claimed by Hunecke Bros. on August 1st, was the property of Gebke, and subject to the liens of the judgments entered that day, and that by a new arrangement between Gebke and Hunecke Bros., made on the 2d day of August, the title was reinvested in Hunecke Bros., and not subject to the later judgments taken by Kingman and others.

3. That the bill of sale executed to Sweet, Dempster & Co., and others, on the 1st day of August, was void and of no effect as against the liens of the judgments and executions, and that such bill of sale should be set aside.

4. That there are not sufficient funds to pay the prior liens and costs.

The court therefore ordered the assignee to first pay the costs, and that the assignee should be allowed $200 for his services, and that the several funds ordered paid, should bear their *pro rata* share of such expenses; second, he shall pay to Gebke $386.50, less his share of costs, due him as exemptions; third, he shall pay the taxes, $26.88; fourth, he shall pay judgment 'of H. N. Wagg & Co.; fifth, he shall pay the judgment of Kingman et al., recovered August 1, 1889; sixth, he shall pay to Hunecke Bros., $442.68, the proceeds of property claimed by them; seventh, the proceeds of sale of property of real estate shall be applied in satisfaction of Kingman's judgment; eighth, balance, if any remaining, shall be distributed *pro rata* among the general creditors. From these orders, Sweet, Dempster & Co. appeal to this court and challenge their correctness.

Mr. H. C. FULLER, for appellants.

Messrs. WILLIAM S. KELLOGG, JAMES A. CAMERON, JOHN M. TENNERY and IRWIN & SLEMMONS, for Howard N. Wagg & Co. and People's Savings Bank, appellees.

Mr. JUDSON STARR, for Hunicke Bros., appellees.

Messrs. J. W. CULBERTSON and I. M. HORNBACKER, for assignor.

LACEY, P. J.   We will first consider the rights of Hunecke Bros. to preferment, to the extent of their claim of goods shipped to Gebke and not accepted by him, amounting to $442.68.   It seems to us clear that neither of the executions could get any lien on those goods, simply for the reason that they were in the care of Gebke.   The latter claimed no title to them, and had never accepted them or mixed them with his other goods, for sale.   He was exercising no acts of ownership over them.   An execution creditor gets no greater interest in the property in the hands of the execution debtor than he himself had.   He had no property in these goods save a mere

possession, nor ever claimed to have any, nor exercised any acts of ownership over them. The deed of assignment conveys only the interest of the assignor and no more. The assignee simply succeeds to the assignor's title. The same rule would apply to the supposed bill of sale although that seems to have been superseded in these proceedings and merged into the assignment. It therefore follows that the proceeds of these goods should be returned to Hunecke Bros., without cost or expense to them. Not belonging to Gebke he would not be entitled to exemptions out of them, nor would they be liable to pay his taxes, having been taken and held wrongfully by the assignee. Hunecke Bros. should be charged no cost in respect to the litigation concerning them.

We will next consider the effect and purport of the supposed bill of sale executed by Gebke to Sweet, Dempster et al.

First. As to its validity as a bill of sale.

Second. As to its bearing and effect upon the subsequent deed of assignment executed by Gebke, under the statute, to Scherber, on the 3rd of August, 1889.

Third. The effect of the bill of sale and the assignment on the alleged prior liens of the various executions in question.

In regard to the first proposition, independent of the Insolvent Debtor's Act of 1887, and the assignment under it, the bill of sale could hardly be regarded as fraudulent as against the execution creditors. It is not exactly certain whether the transaction between Fuller, as the attorney of a portion of the non-execution creditors, and Gebke, the debtor, on the 1st of August, 1889, should be regarded as a sale of the goods to those creditors absolutely for $3,000, or whether it should be regarded as a mere assignment and transfer of the goods to the creditors by Gebke in the nature of a pledge of these goods, accompanied by delivery of possession to the extent of their value; neither is it necessary for us, for the purposes of the decision of this case, to determine that question. We are, however, inclined to think that it could hardly be regarded as an absolute sale. A portion of the proposed purchasers were not present, knew nothing about the transaction and gave no consent to it, and could not have agreed to give $3,000 in cash

for the stock of goods and the small amount of real estate belonging to Gebke, which it has developed by the sales of the assignee was not worth near that amount, and when the claims of the different creditors did not exceed $2,300. There was no balance paid, nor agreed to be paid, for this property by Fuller, or his clients, nor any receipt given for the satisfaction of the different claims. It was a matter fixed up in great haste between Fuller and Gebke to secure those claims ahead of the claims of Wagg & Co. and the People's National Bank, which thay feared were about to be entered up into judgments and executions issued thereon and levied on the goods. We are inclined to think that the bill of sale was really nothing more than an equitable mortgage in fact, nor can we see anything in the evidence that would indicate that there was any intention to cover up the property in order to hinder and delay the collections of the proposed judgments. The amounts of some of the claims represented by Fuller were not even known to them at the time. The intention seemed to be to prefer the claims represented by Fuller, to the other claims, and it was known that there would be nothing left after paying them off. The intention rather seemed to be by the bill of sale to give a preference, and not to defraud the other claims. This, under the common law, without reference to the statute concerning insolvent debtors, a debtor had a right to do. He could use up his entire property, even when he was insolvent, and all parties knew it, in payment of a portion of his debts, to the exclusion of another portion, if done *bona fide* and under circumstances free from fraud. Each of the creditors in this case, those represented by Fuller, and those subsequently procuring judgments, were scrambling to see who would secure his debt first; it was feared there was not enough property to pay all. But in another sense we are inclined to think that the action of Fuller and Gebke in regard to the bill of sale and transfer of the goods, was a clear case of fraud as against the assignment law. We think that Gebke, in view of his insolvency, which he appears to have well understood, had made up his mind to make an assignment for the benefit of his creditors, or a portion of

them; without a doubt, he made his mind up to that effect before these transactions were ended, for he did make an assignment to Scherber on the 3d day of August, 1889, under which these goods are being administered.

We are clear that the creditors represented in the bill of sale can have no preference as against other creditors, for the reason that they were in collusion with Gebke in trying to procure a preference by the bill of sale, when Gebke was in the act of disposing of his entire property for the benefit of a portion of his creditors. The law is, that if a creditor in collusion with the debtor secures a preference by taking an assignment or sale of the debtor's property, prior to the deed of assignment, and when the debtor has the intention of making such assignment, such preference will be held void under the Voluntary Assignment Act. Preston v. Spaulding, 120 Ill. 208; Hanford Oil Co. v. First National Bank, 126 Ill. 584; Hide & Leather National Bank v. Rehm, 126 Ill. 461.

It is said in the first case above cited, in speaking of the Voluntary Assignment Act, as follows: "And we hold it is within the spirit and intent of the statute, that when the debtor has formed a determination to voluntarily dispose of his whole estate and has entered upon that determination, it is immaterial into how many parts the performance or execution of his determination may be broken; the law will regard all his acts, having for their object and effect the disposition of his estate, as parts of a single transaction; and on the execution of a formal assignment, it will, under the statute, draw to it, and the law will regard as embraced within its provisions, all prior acts having for their object and purpose the voluntary transfer or disposition of his estate to or for creditors; and if any preferences are shown to have been made or given by the debtor to one creditor over another in the disposition of his estate, full effect will be given the assignment, and such preferences will * * * be declared void and set aside in fraud of the statute." The other cases above cited are equally emphatic on that point. If it be argued that at the time of the execution of the bill of sale, Gebke had not formed the intention of making an assignment under the stat-

ute, and that therefore the above doctrine would not apply to his case, we would reply that we are inclined to think the evidence, while not perfectly clear outside of the fact that he made the assignment within three days afterward, is, in connection with that fact, sufficient.    As we understand the holding of the courts, all such acts of insolvency as made in this case, followed soon after by an assignment, are to be regarded as a unit and as one act, and it is not absolutely necessary that he should have the intention of making an assignment at the time of the first attempt at preference, but it is sufficient if it is followed by an intention and an assignment.    In the case of Hide & Leather National Bank et al. v. Rehm, 126 Ill. *supra*, Judge Bailey, speaking for the court on a similar point, says:  " So long as he (the debtor) is clearly shown to have entered upon the disposition of his property for the benefit of his creditors at the time he made the judgment notes, the law will indulge in no refinements in order to fix the precise point of time at which he reached the determination to make a general assignment.    All that was done will rather be viewed as parts of the same transaction, so as to make it immaterial whether the determination to make the assignment in fact preceded or followed the execution of the judgment notes." We think, however, that Gebke had the idea of assignment in his mind at the time he went to Fuller, and from his subsequent conduct thereafter, never gave it up.    It can not be claimed that the creditors represented by Fuller were not in collusion with Gebke in attempting to secure this preference. Gebke sought out Fuller, who was paying no attention to those claims or attempting to secure them, and sought his advice and counsel, informing him of his insolvent condition.    The assignment then, in this case, when made, related back to the date of the assignment or bill of sale, and will be treated the same as though the assignment had been made and the property taken possession of by the assignee at the date of the bill of sale, and as though this property had been in the assignee's possession from the time Scherber took possession under such bill.    This disposes of the question of priority of the claimants under the bill of sale when viewed as an original ques-

tion, without reference to their abandonment of such claim, if any, before the County Court. We will now consider the next question as to the effect of this assignment upon the rights of Wagg & Co. and other judgment creditors of Gebke.

It can not be claimed that the judgment creditors were in collusion with Gebke for the purpose of procuring a preference, for the evidence shows, rather, that they were in opposition to his wishes, at least in regard to Wagg & Co. after the signing of the power of attorney to them to confess judgment. They had a right, apparently, not being in collusion with Gebke, to take their judgments, even if they had notice of the intention of Gebke to make an assignment. Home National Bank v. Sanch, 131 Ill. 330.

But the question now arises, whether, in view of the fact that this property was in the hands of Scherber under the supposed bill of sale and the subsequent assignment, the judgment creditors could acquire any lien. We think that under the law, by virtue of the assignee's proceedings being held to relate back to the first possession of Scherber, that it would be too late to obtain a lien by their judgments. They had full notice of this possession, and their executions would be compelled to await all that might be done under it. Another view may be taken of the case as a question of equity. Had there been no subsequent assignment under the statute, Fuller's clients, having possession of these goods, either as purchasers or as pledgees, could have held them as against the executions coming into the hands of the sheriff after possession taken. The judgment would have been subsequent to those claims. By the subsequent assignment, and in accordance with the assignment law, we have shown that the creditors named in the bill of sale must abandon any preference under that law, and the property in the hands of the assignee is not of sufficient value, if those claims were preferred, to pay them off. It is only by virtue of the statute of assignments requiring all claims to be paid *pro rata*, that the judgment creditors may be enabled to get anything. They must invoke the provisions of this statute to set aside the bill of sale

Sweet, Dempster & Co. v. Scherber.

in order to get a preference over those creditors and the other debtors.  They can not make use of it as a sword to prevent an equal distribution, as it was designed to cause such distribution.  The statute is remedial in its nature and should be liberally construed to remedy the evils sought to be remedied. Farwell v. Cohen, filed at Springfield, Ill., June 10, 1891, Supreme Court, Ill.; Home National Bank v. Sanchez, *supra*.

The statute can not be made use of to annul its own provisions. We therefore hold the judgment creditors have no liens by virtue of their executions.  We think the claim of Gebke for exemptions is provided for in the Assignment Act and also in the deed of assignment, and that he is entitled to them.  The order in the court below will therefore be reversed and the cause remanded, with instructions to the court to render an order requiring the assignee to pay the claim of Hunecke Bros. arising out of the shipment of goods which had not been accepted by Gebke, of $442.68, without any costs charged against them or the fund, made in litigating the same; next, that the sum of $386.50 be paid to Joseph F. Gebke as his claim for exemptions, without any cost being taxed against such exemptions; that the assignee next pay the costs and then the taxes, and that whatever remains of the estate he be directed to distribute *pro rata* on all the claims not above ordered to be paid especially, without priority or preference; and to make such distribution of the costs and expenses of administration as equity demands, not inconsistent with this opinion.

Order of distribution reversed and cause remanded with the above directions.

*Reversed and remanded with directions.*

Note.—This opinion is filed on a rehearing, and the case decided the same as in the former opinion of this court, 38 Ill. App. 578.