J. GROETZINGER & COMPANY, *et al.*, Appellants, v. JOHN WYMAN, DES MOINES NATIONAL BANK OF DES MOINES, IOWA, F. H. NICHOLS, W. W. MOONEY & SONS and HENRY H. GRIFFITH.

General Assignment: MORTGAGES. The intention of a chattel mortgagor, not known to the mortgagee, formed before the execution of the mortgage, to make a general assignment for creditors, which was carried out after the execution of the mortgage does not render the mortgage a part of the assignment under the statutes by

virtue of which both the mortgage and the general assignment would be void if the mortgage was treated as a part of the assignment.

SAME. A chattel mortgage upon an entire stock of goods and the book accounts of the business does not constitute a general assignment although the possession is given to an agent of the mortgagee, where such possession is conditional and the mortgagor retains the *jus disponendi* upon payment of the debts secured which do not apparently exceed two-thirds of the value of the property mortgaged.

Mortgages: DELIVERY. Under a contract between a debtor and creditor collateral to the execution of mortgages to secure their claims, mortgages, except to one of the creditors, were delivered at the time, and an agent of the mortgagees appointed to take possession. By a condition of the contract, ratification of the contract by the other creditor was to be optional. *Held* that, all the creditors having signed the contract, the minds of the parties met in the delivery of the mortgages.

FRAUD. Fraud in procuring mortgages cannot be predicated upon the acceptance by creditors of mortgages made and delivered by their debtor, an insolvent, in pursuance of a previous agreement that he would execute the same if he should be unable to meet their claims in accordance with terms then agreed upon, and which he was unable to fulfill.

RECORDING: *Agreements.* M. executed chattel mortgages to a bank, under a written agreement "that said mortgages shall not be recorded unless in the judgment of said bank, it shall become necessary for the protection of the mortgagee, or unless said M. shall be unable to secure extensions of time from all other creditors." *Held*, that this left the matter of recording within the discretion of the bank.

SAME. An understanding that a chattel mortgage shall not be recorded unless in the mortgagee's judgment it is necessary for its protection or unless the mortgagor shall be unable to secure extensions of time from his other creditors does not invalidate the mortgage as against other creditors in the absence of any purpose by the mortgagor to obtain an extension of time from his other creditors without disclosing the existence of a mortgage.

*Appeal from Polk District Court.*—HON. T. F. STEVENSON, Judge.

THURSDAY, MAY 19, 1898.

ACTION to declare certain mortgages, and an assignment for the benefit of creditors, fraudulent. Decree

dismissing the petition, and plaintiffs appeal.—
*Affirmed.*

*E. T. Morris, Park & Odell, Dunshee & Allen* and
*Granger & Bennett* for appellants.

*Dudley & Coffin* and *Cummins, Hewitt & Wright*
for appellees.

LADD, J.—Early in January, 1894, Thomas A. Mans-
field, who had been engaged in the wholesale leather
and saddlery business at Des Moines for several years,
discovered, upon taking an inventory, that his assets
amounted to eighty-six thousand, seven hundred and
ninety-nine dollars and twenty-five cents, and his lia-
bilities to eight-four thousand and thirty-seven dollars
and sixteen cents, leaving the small margin of two thou-
sand, seven hundred and sixty-two dollars and ninety
cents in his favor. Thereupon he exhibited a state-
ment of his financial condition to William Mooney,
of Mooney & Sons, and to R. T. Wellslager, president of
the Des Moines National Bank. After several confer-
ences, a contract was entered into, January 16, 1894,
reciting Mansfield's indebtedness to the bank to be
forty-eight thousand, six hundred and fifty dollars, and
that to W. W. Mooney & Sons, of Columbus, Indiana,
nine thousand, one hundred and eighteen dollars and
forty cents; the demand of these creditors for security,
and Mansfield's belief that, with indulgence, he would
be able, in the ordinary course of business, to discharge
his liabilities; and providing that in consideration of
one dollar, and the promise of said creditors not to
enforce all of said indebtedness at the present
time, Mansfield, upon his part, agreed to pay said
parties a certain amount during that and each of
the five months following, and: "Third. That he will,
in case demand be made upon him by either the said

Des Moines National Bank or said W. W. Mooney & Sons, give unto them (said bank and W. W. Mooney & Sons) a chattel mortgage upon all his stock of merchandise, consisting of saddlery, hardware, harness, leather, and findings, and store fixtures, of every kind and character whatsoever, owned and kept by him in storerooms Nos. 221 and 223 Court Ave., and also in room No. 209 West Third street, and room over 219 Court Ave., in the city of Des Moines, Polk county, Iowa, and will also, upon like demand, assign unto said creditors, all and singular, his accounts and demands and bills receivable owing to him, and arising out of said business so carried on by him; such chattel mortgage and the assignment of said accounts to be as security for such sums of money as may be due and owing by said Mansfield to the said Des Moines National Bank and W. W. Mooney & Sons, respectively, at the time of giving of such security. And it is further agreed that said creditors shall have a lien upon the above-described personal property and choses in action to secure the performance of this contract upon the part of Mansfield." Mansfield continued in business, but was unable to comply with the terms of the contract. About the middle of February, Mooney & Sons and the bank requested him to secure their indebtedness. He insisted, and they finally conceded, that he was entitled to the entire month of February within which to make payments then maturing. During these negotiations a general assignment for the benefit of his creditors was signed, with the intention of placing it on record in event the bank or Mooney & Sons attempted to obtain preferences; but this was afterwards destroyed. On February 28th the attorney of Mansfield notified the bank that he was unable to meet the payments under the contract, and was ready to execute the mortgages, but desired a conference of the officers of the bank. This was had, and, as the outcome, Mansfield executed a

chattel mortgage upon his entire stock of goods, fixtures, and tools owned by him, and also transferred and assigned all book accounts, demands, or bills receivable, due or to become due, to the Des Moines National Bank, to secure the payment of eighteen thousand, five hundred and fifty dollars; also, a mortgage describing the identical property to W. W. Mooney & Sons, securing the payment of seven thousand, six hundred and seventy-six dollars and forty-eight cents; also, another mortgage to F. H. Nichols, trustee, covering the same property, securing notes to the amount of twenty-nine thousand, six hundred dollars. It may be added that these notes had been executed by Mansfield to Mooney & Sons, indorsed by the latter firm, and discounted by Mansfield to the Des Moines National Bank, and that Nichols simply acted as trustee for the bank. No question is made as to the validity of the indebtedness secured. At the time these mortgages were executed a contract was entered into, reciting the execution thereof, and as follows: "Now, therefore, it is agreed that T. E. Given shall take possession of said property as the agent of said mortgagees, and shall account to them for all expenses paid by him, and money and property thus coming into his possession; that said mortgages shall not be recorded unless, in the judgment of said bank, it shall become necessary for the protection of the interests of said mortgagees, or unless said Mansfield shall be unable to secure extensions of time from all of his other creditors; that if such extensions shall be secured, and if it shall not be necessary to record such mortgages as aforesaid, that said Mansfield shall remain in charge of such business; said Given still accounting to such mortgagees for all receipts and collections aforesaid; said Mansfield receiving not to exceed $150.00 per month for his services; and no purchase of goods shall be made, or indebtedness incurred,

except upon the consent of said mortgagees, but all expenses shall be cut down as fast as possible, and goods purchased upon such consent shall be paid for by said Given from the money received by him. The delivery of said mortgage to W. W. Mooney & Sons is conditioned upon their acceptance of, and ratification of this agreement; and, should they refuse to accept or ratify the same, then said Mooney & Sons shall be remitted to such rights as they may have under the agreement entered into by said Mansfield, said bank, and said Mooney & Sons, dated January 16, 1894; and in such event nothing contained in this agreement, nor the acceptance by said bank of the mortgage herein mentioned as made to said bank, shall deprive said bank of its rights under said agreement of January 16, 1894, or have any effect whatever upon its said rights." On the same evening, without the knowledge of the mortgagees, Mansfield executed a mortgage to H. H. Griffith, as trustee, securing the claim of G. D. King for the sum of eight hundred and forty-eight dollars and ninety cents, and an attorney's fee of five hundred dollars owing Henry, and signed a deed of general assignment for the benefit of creditors to John Wyman. These were left in the hands of Griffith, with instructions to secure the acceptance of Wyman, and place on record when directed. Mansfield and Reynolds, cashier of the bank, arranged to meet at the Great Northern Hotel in Chicago the following day, and each telegraphed Mooney to this effect. Reynolds, after conversing with Mooney, went to the hotel, where he met Mansfield and Henry, and Mooney soon followed. An appointment was made for the afternoon, and they again met, when Mooney signed the contract heretofore referred to. It appears that the Globe Tanning Company, of Louisville, Kentucky, of which Thomas Mooney was president, was also a creditor. After the contract had been signed,

Mansfield asked Mooney if this company would extend
the time of payment, and was informed it would not.
Upon inquiries, he was then told that the company
would proceed against him by attaching his property.
Henry at once telegraphed to Griffith to file the deed
of general assignment for record. Reynolds had already
telegraphed the bank to record the three mortgages,
and Mooney, in behalf of the Globe Tanning Company,
had ordered the attachment proceedings. The
three mortgages were filed first, though less than
a half hour prior to the filing of the mortgage to
Griffith and the assignment to Wyman. The plaintiffs
have recovered judgments against Mansfield, and join
in this action, asking relief against the mortgages of the
bank, Nichols, and Mooney & Sons. The evidence
shows, without dispute, that there is enough money in
the hands of the Des Moines National Bank and John
Wyman, as assignee, to satisfy all these judgments. It
may be added that Wyman took possession of the prop-
erty as assignee, and, under the direction of the court,
sold it, and applied the proceeds to the payment of the
mortgages attacked.

I.   The contention of appellants that the minds of
the parties never met in the matter of delivering the
mortgages is not sustained by the evidence. By the
terms of the contract, those to the bank and
Nichols were delivered at the time, and Given
appointed to take possession as their agent. The
conditions relate to ratifications by Mooney & Sons, and
this firm accepted the mortgage by signing the contract.
Nor were these securities obtained by fraud. Under the
agreement of January 16, 1894, Mansfield had obligated
himself to execute them, and in so doing he was simply
complying with the terms of that contract. This con-
tract was not pleaded, but was admissible in evidence,
as bearing on the *bona fides* of the transaction. As to

whether there was an oral understanding that the mortgages should not be recorded, there is some conflict in the evidence, but we are satisfied that the mortgagees expressly refused to enter into any such arrangement. The understanding was reduced to writing, and this provides "that said mortgages shall not be recorded unless, in the judgment of said bank, it shall become necessary for the protection of the mortgagee, or unless said Mansfield shall be unable to secure extensions of time from all his other creditors." This left the matter of recording within the discretion of the bank. It could record or not, as it might see fit. If Mansfield was unable to secure the extension of time for the payment of other claims, it was recognized that he could not go on with his business, and in that event the matter of recording was immaterial to him.

II.   Nor was it the purpose of the agreement to withhold the mortgages from record in order to enable Mansfield to obtain an extension of time from his other creditors without disclosing their existence.   Even though Mansfield had such intention, if it was not disclosed to the defendants the validity of their mortgages was not affected.   *Kohn v. Clement*, 58 Iowa, 589. While his testimony tends to show such an understanding, he is contradicted by several witnesses, and his attorney is unable to recall any such conversation.   We think the evidence fairly warrants the conclusion that he was hopeful of leniency from his creditors, with whom he had dealt for many years, and believed, by explaining the exact condition of his business, further time would be given within which to meet their demands.   The advantage of doing this himself before any reports reached them from others was well understood.   The immediate recording of the mortgages would be likely to precipitate a contest, which would defeat his object.   They were to be withheld to enable

him to obtain extension from his creditors by telling the truth, and not by misleading them. If Mansfield had any other purpose, we think the evidence fails to show that it was disclosed to the mortgagees; and they had the right to rely upon him acting in good faith, rather than the contrary. A sufficient answer to this contention, however, is that the mortgages were in fact recorded, and the unlawful purpose, if it existed, was never carried out. The mere purpose to defraud, without more, is not actionable.

III. The mortgages did not constitute a general assignment, because not so intended by the parties. The purpose was to secure the payment of a valid indebtedness, in pursuance of the debtor's promise made six weeks before. They were not executed to Given, as trustee, but he was merely made the agent of the mortgagees in satisfying the debt from the incumbered property. Even this possession was conditional, and Mansfield expected to adjust his affairs and resume his business. While not in possession, he retained the *jus disponendi* upon payment of the debts secured, which apparently did not exceed two-thirds of the value of the property. He did not intend to devest himself of the title or control. The facts bring the case within the rule approved in *Lampson v. Arnold*, 19 Iowa, 479; *Aulman v. Aulman*, 71 Iowa, 124; *Gage v. Parry*, 69 Iowa, 605; *White-Lead Co. v. Haas*, 73 Iowa, 399; *Bank v. Crittenden*, 66 Iowa, 240; *Kohn v. Clement*, 58 Iowa, 592.

IV. The appellants insist that the mortgages are a part of the general assignment for the benefit of creditors, and constitute a preference. It will be remembered that Mansfield had formed the plan of giving the mortgages, and preparing a deed of general assignment,

to be filed in event he was unable to satisfactorily arrange with his other creditors before any of the instruments were executed. The mortgages were executed before this deed was signed, and the delivery of the latter was contingent upon his failure to obtain concessions from his other creditors. If he should succeed, the assignment would not be made. The execution of the mortgages, however, was not dependent upon any contingency. Certainly, until the happening of this contingency, Mansfield did not intend the assigment to be effective. But, if it be conceded that he was carrying out a preconceived plan of disposing of his entire property, the mortgagee had no knowledge of any purpose on his part save that of securing an indebtedness due them. It is said, however, that if the debtor makes a preference under such circumstances, and thereby violates the statute, the intent or knowledge of the creditor is immaterial. This point is not determined in *Lampson v. Arnold*, 19 Iowa, 479; for it is there held that he might discharge debts by the payment of money or property, even though after an assignment had been determined upon. Such payments were no part of the transaction by which the debtor's property was assigned. See *Van Patten v. Burr*, 52 Iowa, 518. In the same case, reported in 55 Iowa, 224, this language is used: "The preponderance of the evidence, we think, shows that the mortgage to John Ruch, though dated on the 30th, was in fact executed and delivered on the 29th of November. But, whether executed or delivered upon the 29th or 30th of November, we are satisfied that it was executed and delivered before the assignment, and without any knowledge upon the part of Ruch of the intention to execute the assignment. The mortgage, so far as the evidence shows, formed no part of the general assignment, but was altogether distinct and separate from it. It was

valid at the time of its execution, and is not invalidated by the subsequent execution of the assignment." While the want of knowledge is mentioned, it does not appear that this was the controlling consideration in the case, although so stated in the syllabus. We call attention to this because of appellees' contention that the case is decisive of the question now before us. It has never been passed upon in this state, and the decisions elsewhere are not in harmony. In *Preston v. Spaulding*, 120 Ill. 208 (10 N. E. Rep. 903), the court says: "It is a misapprehension to suppose that this voluntary assignment act attempts to regulate the conduct of creditors. What it does is to regulate the conduct of the debtor, and declare void preference made or given by him in an assignment of his estate." In *Bank v. Rehn*, 126 Ill. 461 (18 N. E. Rep. 788), the question is disposed of in this remark: "Since the decision of this court in *Preston v. Spaulding*, 120 Ill. 208 (10 N. E. Rep. 903), the law must be regarded as settled in this state that, after a debtor has made up his mind to make an assignment of his property for the benefit of his creditors, all conveyances, transfers, and other dispositions of his property or assets, made in view of his intended general assignment, whereby a preference is given, will be held to be within the prohibition of the statute, and void, the same as though incorporated in the deed of assignment itself." See, also, *Hanford Oil Co. v. First National Bank of Chicago*, 126 Ill. 584 (21 N. E. Rep. 483). *White v. Cotzhausen*, 129 U. S. 329 (9 Sup. Ct. Rep. 309), followed the construction given by the supreme court of Illinois. See *Union Bank of Chicago v. Kansas City Bank*, 136 U. S. 223 (10 Sup. Ct. Rep. 1013). It is said in *Sturtevant v. Sarbach*, 58 Kan. 410 49 (Pac. Rep. 522): "An assignment with a preference is not permissible under any circumstances, and in such cases mortgages made at the same time, or any other

attempted preference, must be treated as a nullity, without regard to the knowledge or good faith of the creditor attempted to be preferred. His ignorance of the purpose of the assignor to make an assignment, or good faith in attempting to secure a preference does not affect the assignment or change the rule of *pro rata* distribution for which the statute provides." Thus, the conclusions, rather than the reasons for reaching them, are stated in these cases. The statutes of these states invalidate the preferences, not the deed of assignment, as in Iowa, and the preferred creditor is simply relegated to his *pro rata* share of the assigned estate. Here, if the security constitutes a preference, and is adjudged a part of the general assignment, both are void. The result is an important consideration in construing the law. If the validity of a mortgage executed by a debtor in failing circumstances, is wholly dependent on the condition of his mind, without regard to what the creditor may know, then security under such circumstances cannot be taken without hazarding the collection of the debt. What might be in the debtor's mind cannot be definitely ascertained, and, instead of additional assurance of payment, the security would simply place the creditor at the mercy of his debtor. Our statute does not require a construction which will render hazardous the taking of security for the payment of an honest debt, or which will necessarily limit the possibilities of the debtor in guarding his interests by giving better assurance of final satisfaction. This conclusion is not unsupported by authority. The question is touched in *Lake Shore Banking Co. v. Fuller*, 110 Pa. St. 156, (1 Atl. Rep. 731), and this language used: "Nor can we agree that a mere intent of the debtor, unexpressed to the creditor, to give him a preference by paying or securing the debt, although at the time he contemplated, and soon after executed, a general assignment, operates to defeat such

preference, on the ground that it is contrary to the act of 1843. Such an intent is not unlawful, and cannot be inferred from a proper act. But, even if it were, the creditor, who has a perfect right to accept payment or security of his debt, and has not participated in the alleged unlawful intent, should not be compelled to forfeit his preference on that account. He, at least, is innocent, and may in good conscience hold the advantage he has obtained." The supreme court of Indiana, in declining to follow *Preston v. Spaulding, supra,* employ this language: "So long as the proposed assignment remains mere matter of intention, contemplation, or determination, the debtor has done nothing to abdicate the dominion which the law gives him over his property. He may be hopelessly insolvent for months, or, indeed, as is averred in this complaint, he may be insolvent for more than a year, before he makes the assignment. During all of that time he may know of such insolvency, and may contemplate making an assignment. Indeed, he may fully reach the determination to make it, but defer the execution of that purpose; and, when such purpose is finally consummated, will it do to say that a court of equity will attempt to reach back, and undo all preferences given since that determination took form in his mind? Many practical difficulties would beset the chancellor in attempting to apply such a rule. Reaching the determination to make such assignment is a mental process in the debtor's mind. How may the time be fixed when he thus determined? How far back would the chancellor go in his inquisition into the debtor's state of mind? Certain formalities are necessary to consummate such a purpose, and we think it may fairly be said that, when the debtor has once entered upon the doing of these formal

acts necessary to make the assignment, he cannot there-
after make any valid preference, if he preserves and com-
pletes the assignment thus begun." *John Shillito Co.
v. McConnell*, 130 Ind. 31, (26 N. E. Rep. 832). It is true, as
stated by the appellants, that the holding in Pennsylva-
nia is that preferences, to invalidate the general assign-
ment, must be contained in the same instrument, and in
Indiana must be executed contemporaneously there-
with. The New York statute permits preferences to the
extent of one-third in value of the debtor's property;
but, if in excess, they are reduced to this amount, and
the assignment does not become void. See *Abegg v.
Bishop*, 142 N. Y. 286 (36 N. E. Rep. 1085); *Central
Nat. Bank v. Seligman*, 138 N. Y. 435 (34 N. E.
Rep. 196). The question under consideration was before
the court of appeals of New York in *Manning v. Beck*,
129 N. Y. 1 (29 N. E. Rep. 90); and the court, through
Peckham, J., said: "Any preference the debtor therein
makes which runs counter to the statute must be
treated as the statute directs, and the intent of the
assignor in giving the preference is wholly immaterial.
But the statute does not, and was not intended to, pre-
vent a creditor from obtaining payment or a security,
and thereby a preference for his debt, even from an
insolvent debtor; and, where a court is asked to set
aside a security which is disconnected from and prior to
any general assignment, on the ground that it is a
violation of the act in relation to preferences in general
assignments, it at once becomes a question whether that
act was ever intended to cover a case where the creditor
obtaining or availing himself of such securities was
ignorant of any existing intention on the part of the
debtor to thereafter perform an entirely separate act,
and make a general assignment. It does not in terms
cover such a case, and we think it should not be thus
extended by construction." We conclude that even
though at the time a mortgage is executed the debtor

has determined upon a general assignment of all his property for the benefit of his creditors, which he afterwards makes, if this fact is unknown to the creditor, the mortgage received in good faith to secure a valid indebtedness does not become a part of the scheme, but is a separate and valid instrument.—AFFIRMED.